8IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

BRIAN KEITH WILSON                                            PLAINTIFF

                v.                        Civil No. 09-2064

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                DEFENDANT

<u>**MEMORANDUM OPINION**</u>

        Plaintiff, Brian Wilson, brings this action under 42 U.S.C. § 405(g), seeking judicial review of

a decision of the Commissioner of Social Security Administration (Commissioner) denying his claim for

a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI")

under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A).  In this judicial review, the court must determine whether there is substantial evidence

in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

**I.      Procedural Background**

        The plaintiff filed his applications for DIB and SSI on January 13, 2006, alleging an onset date

of November 20, 2002, due to manic depressive disorder, explosive personality disorder, anxiety,

attention deficit hyperactivity disorder ("ADHD"), diabetes with neuropathy in his feet, carpal tunnel

syndrome, and hearing loss.  (Tr. 33-34, 38-42, 51-52, 164-165, 196-197, 438-481).  His applications

were initially denied and that denial was upheld upon reconsideration.  (Tr. 66-69).  Plaintiff then made

a request for a hearing by an Administrative Law Judge (ALJ).  An administrative hearing was held on

September 9, 2008.  (Tr. 8-63).  Plaintiff was present and represented by counsel.

        At this time, plaintiff was 42 years of age and possessed a high school education.  (Tr. 14, ).  He

had also attended college and earned approximately 30 college hours with a cumulative grade point

average of 2.05, but no degree.[1]  (Tr. 14, 227-229).  Plaintiff had past relevant work ("PRW") experience

as an appliance assembler, production helper, and machine tender.  (Tr. 24-33, 83).

On November 21, 2008, the ALJ found that plaintiff's diabetes mellitus with diabetic

neuropathy, hearing loss, depression, intermittent explosive disorder and/or personality disorder not

otherwise specified, and ADHD were severe but did not meet or medically equal one of the listed

impairments in Appendix 1, Subpart P, Regulation No. 4.  (Tr. 75-79).  After partially discrediting

plaintiff's subjective complaints, the ALJ determined that plaintiff retained the residual functional

capacity to perform unskilled light work that does not involve transaction interaction with the public.

(Tr. 79-83).  Further, the ALJ also found that plaintiff could only tolerate occasional exposure to loud,

background noise; occasional telephone usage; and, could only occasionally crawl, climb ladders, ropes,

and scaffolds.  Plaintiff could frequently handle and finger.  With the assistance of a vocational expert,

the ALJ found plaintiff could perform work as a shirt presser, laundry worker, machine tender, and

inspector.  (Tr. 58-59, 84-85).

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied

on April 24, 2009.  (Tr. 1-5).  Subsequently, plaintiff filed this action.  (Doc. # 1).  This case is before

the undersigned by consent of the parties.  Both parties have filed appeal briefs, and the case is now

ready for decision.  (Doc. # 10, 11).

## II.     Applicable Law

This court's role is to determine whether the Commissioner's findings are supported by

substantial evidence on the record as a whole.  *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002).

Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it

adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record

---

[1]Plaintiff's transcript shows that he obtained 30 hours of college credit, but attempted 34 hours.  (Tr. 228-229).

contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

A.     **The Evaluation Process**:

The Commissioner's regulations require his to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider

AO72A
(Rev. 8/82)

the plaintiff's age, education, and work experience in light of his or her residual functional capacity.  *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

**III.    Evidence Presented:**

On December 5, 2002, plaintiff underwent a psychiatric assessment with Sonja Armstrong, a nurse practitioner at Western Arkansas Counseling and Guidance Center ("WACGC").  (Tr. 230-232). He reported suicidal ideation and isolative tendencies.  Plaintiff stated that the stress was overwhelming. He was employed at Whirpool, but due to significant stressors and a labile mood, he had missed the previous five days of work.  Plaintiff was concerned about missing work and very concerned about his finances.  He reported a history of depressive symptoms to include impaired memory, hopelessness, decreased sleep, awaking feeling unrested, unstable appetite, increased weight, fatigue, a sense of worthlessness, and decreased concentration that had become unmanageable in June.  Plaintiff identified extreme financial stressors as the trigger and admitted experiencing daily anxiety, frequently escalating into extreme irritability and even physical and verbal aggression with his family.  He had also been experiencing suicidal ideation for approximately eighteen months, thinking of jumping off a bridge.  His children were the protective factor, preventing him from acting on his ideations.  At this time, plaintiff denied suicidal ideation, sadness, or guilt.  He stated that he drank no more than two alcoholic beverages per year and denied the use of illicit or recreational drugs and prescription drug abuse.  Plaintiff also denied a history of inpatient or outpatient mental health treatment.  He was a smoker, smoking one package of cigarettes per day.

Plaintiff was mostly pleasant, cooperative, and maintained good eye contact.  His gait was within normal limits, he was fully alert and oriented, his speech was goal directed and within normal limits, his mood euthymic, and his affect congruent.  Plaintiff's thought content was negative for auditory or visual hallucinations and there was no evidence of delusions.  Ms. Armstrong diagnosed plaintiff with major depressive disorder and assessed him with a global assessment of functioning score of 55.  She

4

recommended that he take Celexa (depression), Trileptal (mood stabilizer), and Risperdal (treat aggression, anger, anxiety, and sleeplessness).  (Tr. 230-232).

On December 16, 2002, plaintiff felt that the medication was helping him focus.  (Tr. 237-238).  He continued to experience suicidal thought, but denied a current plan.  Plaintiff agreed to continue his safety contract.  He was still very pessimistic, stating that his car had recently broken down and that he did not have the money to get it repaired.  Plaintiff was borrowing his bother-in-law's car and was very stressed.  Whirpool had reportedly agreed to pay him family medical leave pay for the next two weeks.  He was scheduled to return to work on January 2.  Plaintiff was apprehensive about his capabilities.  Plaintiff was having trouble handling crowds and experiencing panic symptoms when the phone rang or someone came to his door.  However, he was making candles as an outlet and enjoying it.  Plaintiff reported difficulty dealing with his extended family and their intrusiveness.  He did not want to take financial help from others, although he was concerned about providing Christmas presents for his children.  He also indicated that three of the children presently residing with them would return to their mother in January.  (Tr. 237-238).

On December 19, 2002, plaintiff saw Ms. Armstrong.  (Tr. 277).  She noted his diagnoses of major depression and generalized anxiety disorder.  Plaintiff presented with decreased irritability, depression, suicidal ideation, and aggression.  He indicated that the suicidal ideation had become less intense and occurred only in situations with increased irritability and anxiety.  His irritability had completely abated in settings with his children and his wife.  However, in social settings, it increased, especially around relatives.  Plaintiff's last aggressive episode had been the previous Monday when he verbally assaulted one relative and physically assaulted another.  He rated his depression as a 6 on a 10 point scale.  Ms. Armstrong noted that his speech was goal directed and his thought processes linear.  Plaintiff's mood was euthymic and his affect and mood congruent.  His medication was noted to be only moderately effective.  Plaintiff's medications included Risperdal, Trileptal, and Celexa.  (Tr. 277).

On January 6, 2003, plaintiff had improved, but did not feel up to returning to work.  (Tr. 239-240).  He requested and received a letter to his employer deferring the decision to return to work until after his next appointment with the nurse practitioner on January 26.  Plaintiff continued to experience suicidal ideations, although he denied any current plan.  His financial situation had improved because they had received money from his wife's student loans.  Plaintiff continued to experience difficulty setting boundaries with his mother and his wife's siblings.  He stated that the family consistently made derogatory statements about his mental state causing him to avoid their phone calls.  Their statements made him angry and resulted in confrontations.  Linda Howard, a counselor at WACGC, discussed the role of responsibility for handling the situation and role-played a possible conversation and alternative communication with plaintiff.  They also discussed how his attitude toward the situation could be serving to maintain the problems and that his anger could be a method of avoidance.  Ms. Howard expressed the need for him to take responsibility for his actions, attitudes, and self-talk.  As homeward, he was assigned to answer his mother's calls one time per day and to taken an adult role with her in conversation.  Plaintiff was encouraged to calmly tell her when the things she said were hurtful to him, rather than becoming angry and argumentative.  (Tr. 239-340).

On January 15, 2003, plaintiff continued to experience anger and anxiety.  (Tr. 241).  He was reportedly trying to go to the store more in an effort to learn to handle himself better.  However, plaintiff continued to experience anxiety and the need to go outside the store "and get a breath of fresh air" due to the crowds and delays.  He also reported continued difficulty sleeping, sleeping an average of three to four hours per night.  Plaintiff felt that if anything could go wrong, it would.  Ms. Howard discussed with him the idea of choosing his battles and not stressing out over the little things.  Thought stopping techniques were implemented by the use of imagery and reality based positive, cognitive messages were discussed. Ms. Howard also asked him to cite occasions when situations were handled positively without anger.  (Tr. 241).

AO72A
(Rev. 8/82)

On January 20, 2003, plaintiff presented complaining of continued problems with sleep, obtaining only 30 minutes of sleep the previous night. (Tr. 278-279). His physical presentation was fatigued. Plaintiff's depression remained a concern as it continued to wax and wane. He denied suicidal ideation and reported only experiencing aggression in the presence of his brother-in-law. This brother-in-law had caused significant stress by leaving his children in the care of plaintiff and his wife without helping them financially. Ms. Armstrong discussed cognitive restructuring with behavioral interventions such as meditation and deep breathing. She also suggested compromising with the brother-in-law, since he only visited occasionally. Ms. Armstrong prescribed Trazodone. She noted that his mood was euthymic and his affect congruent. Plaintiff was taking his medication as prescribed and currently a low risk of danger to others. (Tr. 278-279).

On January 22, 2003, plaintiff was agitated over several things he felt had not gone right. (Tr. 242). He again stated how he felt nothing positive happened to him, but denied experiencing suicidal ideations. Plaintiff reported angry confrontations on the phone with telemarketers and bill collectors. He continued to experience difficulty sleeping and had not started taking the Trazodone recently prescribed. Plaintiff was concerned about returning to work and did not feel he was capable of working at that time. He had an appointment for a physical on January 27. Ms. Howard asked plaintiff to begin to process the negative impact anger had on his life. She discussed nonaggressive methods of dealing with anger triggers. At this time, Ms. Howard noted that plaintiff was restless and agitated with appropriate affective expression, preoccupations in thought content, and posed a low risk of danger to himself. (Tr. 242).

On January 27, 2003, the Trazodone was noted to be effective in helping plaintiff to obtain more restful sleep. (Tr. 280). However, he was fatigued and lethargic during the day, so Ms. Armstrong decreased his dosage. She noted that his medication seemed to be effective for the targeted symptoms. (Tr. 280).

7

On January 29, 2003, plaintiff had improved in some areas.  (Tr. 243-244).  He denied suicidal ideation and stated that his physical exam had been postponed until February 20.  Plaintiff still did not feel he was capable of working.  He continued to work on anger management issues and reported that he and his wife had not been arguing as much.  However, he had recently gotten into a fist fight with his brother-in-law.  Plaintiff had a restraining order against this brother-in-law, but the man came to his house anyway and "started trouble," so he took matters into his own hands and fought with him.  Ms. Howard discussed with plaintiff ways he could have handled the matter differently and role-played a scenario.  Plaintiff admitted to having a long history of physical confrontations perpetuated by the fact that he was of short stature and felt he had to prove himself.  Ms. Howard noted that plaintiff was beginning to process some of his issues, but continued to experience panic attacks.  Plaintiff stated that he was trying to go grocery shopping more and was handling it without having to leave the store.  He continued to use relaxation and diversion activities as a method of decreasing anxiety.  Plaintiff stated that he felt he had a better sense of self worth, but continued to feel some hopelessness over things he did not feel in control of.  Ms. Howard discussed thought stopping and cognitive change methods to begin to retrain his thought patterns.  As homework, she assigned him to practice these methods with family members he routinely had confrontations with or in any setting that occurred.  (Tr. 243-244).

On February 5, 2003, plaintiff was having trouble with the boyfriend of a family member who he did not feel should be around the children in that home.  (Tr. 245).  Plaintiff and his wife had custody of these children in the past and they were recently returned to their mother's care.  He discussed the repercussions of taking matters into his own hands and did not feel that he had many choices.  Plaintiff stated that he had minor verbal altercations routinely with strangers when in public places.  Ms. Howard discussed setting boundaries, making cognitive changes, and behavior modification techniques that he could use in situations instead of acting out in anger.  Plaintiff agreed to try these methods but was not completely convinced he would be able to control himself on all occasions.  Plaintiff was to be

reevaluated regarding his ability to return to work at his next appointment with Ms. Armstrong on February 21. However, plaintiff still did not feel he had the anger management skills in place to handle the stressors of the workplace. His objectives remained the same, to put into action some of the behavior modifications discussed in therapy. At this time, Ms. Howard noted that he was restless and agitated with an appropriate affective expression, preoccupations in his thoughts, and a moderate risk of danger to others. (Tr. 245).

On February 20, 2003, plaintiff had not been taking the Trazodone as prescribed, rather only as needed. (Tr. 281). Accordingly, Ms. Armstrong changed his prescription to as needed. There were no reported changes in plaintiff's condition. He rated his depression as a 3 and denied current anxiety or sleep problems. (Tr. 281).

On March 5, 2003, plaintiff was very upset. (Tr. 246). He had received a notice from the courts that he had to appear on March 19 regarding an incident that had occurred the previous year. Plaintiff was afraid he might have to go to prison for up to one year and if that happened, he was contemplating either suicide or disappearing. Ms. Howard discussed the negative impact this could have on his family. He verbally contracted that he would not be alone when he had these feeling and would call the counseling center or go to the nearest emergency room. Plaintiff appeared preoccupied in his thoughts and displayed poor judgment. He reported feeling overwhelmed because he had several pressing financial issues at this time. Plaintiff was also experiencing panic symptoms and avoiding crowds. He admitted feelings of extreme agitation and stated that he did not want to get "into it with anyone." Plaintiff did not feel that he could function in the workplace at this time. Relaxation, positive self-talk, role-play, and methods for setting small achievable goals were discussed by Ms. Howard. (Tr. 246).

On March 17, 2003, plaintiff felt calmer and not as agitated. (Tr. 247). His panic and depression symptoms had also improved. He was scheduled for court on March 19, and had checked into the financial assistance his family might receive if he had to go to prison. Plaintiff had not yet returned to

9

his job at Whirpool and planned to draw unemployment.  He stated that most of his financial issues had resolved.  Plaintiff was trying to avoid the court issue with his mother.  Ms. Howard discussed appropriate boundary setting with his mother and he admitted having a problem with that.  They role-played typical conversations and changes he could make.  Plaintiff stated that he avoided answering the door or telephone.  He reported that things were better with the situation with his nieces and nephews, as their parents were showing themselves to be more responsible for their own children.  Ms. Howard assigned plaintiff homework to consist of answering the door and phone and dealing with the situations appropriately instead of avoiding them.  (Tr. 247).

On April 2, 2003, stated he felt much better.  (Tr. 249-250).  He had reportedly made it through his court appearance without unmanageable distress or panic.  Plaintiff did not receive incarceration and got a manageable fine to pay.  He was now drawing his unemployment and was financially secure, giving him peace of mind.  Plaintiff stated that his wife was working.  He was doing repairs and making revisions to their home providing him with a sense of accomplishment.  When asked about his plans for employment, he indicated that he had applied for a job driving a city transport bus.  Plaintiff indicated that he was still hesitant about his ability to maintain employment due to agitation in crowds and little tolerance for others.  However, he had began to answer the door and the telephone and felt he we effectively dealing with everyday things as they arose.  Plaintiff continued to avoid contact with his mother.  Ms. Howard noted that plaintiff was processing alternative interactions with his mother and recommended that he take the lead in making contact with her at least once per week.  As homework, he was assigned to call or go to his mother's home just for the purpose of social visit at least once per week.  Ms. Howard's notes indicate that plaintiff motor behavior was normal, his affective expression appropriate and his cognition logical and coherent.  He posed no risk of danger to himself or others.  (Tr. 249-250).

On April 15, 2003, plaintiff denied all symptoms and side effects. (Tr. 282). He rated his depression as a 2 on a 10 point scale. Plaintiff was receiving unemployment and was not working. Ms. Armstrong noted that his mood was euthymic and his affect congruent. His medication seemed effective for the targeted symptoms and he posed no danger to himself or others. (Tr. 282).

On April 21, 2003, plaintiff felt he was doing a little better. (Tr. 251-252). He reported drawing unemployment and spending his time making repairs and renovations to his home. Plaintiff had been in regular contact with his mother and was also working on his parent's home. He felt that their relationship had improved and that he was setting better boundaries. Plaintiff reported very few thoughts of flight or suicidal ideation. However, he continued to experience agitation when in crowds and avoided going to stores at peak hours. Plaintiff stated that "other people's stupidity" made him angry and he frequently left the store and sat in the car while his wife finished the shopping. He was processing his feelings of anger and stated that he related some of it to the past problems he had with his brothers-in-law. Ms. Howard discussed with him the need to take 100% responsibility for his own actions despite what anyone else did and discussed relaxation techniques he could use to deflect what he perceived to be "other people's stupidity" when he was in a crowd. His homework assignment was to reflect on his own aggressive behavior and practice the relaxation techniques discussed. (Tr. 251-252).

On May 14, 2003, plaintiff continued to feel he was doing well, but was experiencing panic and irritation in crowds. (Tr. 253-254). Plaintiff was coping with these feelings by avoiding situations that provoked him. He reported continued negative thoughts and some success with the thought stopping techniques he had been working on. Plaintiff was doing "alright" financially, drawing his unemployment. However, he was uncertain what he was going to do when is unemployment benefits ran out. Plaintiff stated that the situation with his mother and extended family members had improved and he felt that he was setting better boundaries with them. He discussed with Ms. Howard how he could

11

learn coping skills regarding the stressors that led to irritation and panic attacks in crowded places. Plaintiff stated he felt his stress level was currently at a 7 on a 10 point scale. Ms. Howard discussed changes he could make to decrease his stress level by two points, role-played encounters with plaintiff that might commonly occur during a visit to the store, and discussed his need to become capable of successfully reentering the workplace and processing the behavior and reactionary changes he felt he needed to make. As homework, plaintiff agreed to practice the techniques discussed. (Tr. 253-254).

On June 9, 2003, plaintiff was agitated about a situation with his son's baseball coach. (Tr. 255). Plaintiff felt his aggression level was at a level 9. Regarding other situations, plaintiff felt his aggression was at a level 3. Ms. Howard discussed boundary setting with the son's coach. Plaintiff voiced his understanding of his need to set boundaries and conduct himself with self-control. He discussed ways in which he may be receiving rewards from thinking about behaving in an aggressive manner, discussed the type of role model he desires to be for his son, and stated that he experienced less panic attacks in crowds and she felt he was maintaining better focus. For homework, plaintiff was to apply relaxation techniques to deal with aggressive tendencies. (Tr. 255).

On June 25, 2003, plaintiff acknowledged that his medical regimen was significantly effective, denying all symptoms of depression, anxiety, sleep disturbance, anger problems, and explosive episodes. (Tr. 283). Ms. Armstrong made no changes to his medications and noted that he was cooperative and alert with a euthymic mood and a congruent affect. He was taking his medication as prescribed and posed no risk of danger to self or others. (Tr. 283).

On July 21, 2003, plaintiff felt less agitated, but reported continued panic and agitation in crowded places or when he "stressed about something." (Tr. 256-257). He stated that he had gotten into a fistfight with his son's baseball coach before the season ended because the coach called his son stupid when he missed a play. Plaintiff was not concerned about the consequences for his actions, despite his current legal issues, because he felt physical force was the only way to handle the situation. He stated

12

that he was aware that he received rewards from this type of behavior, but felt he was doing well because he had only become aggressive 3 times in the last 4-5 weeks. Plaintiff was reportedly completely off all medication and felt better without it. He was sleeping much better and felt his anxiety was no worse than with medication. Plaintiff was having extensive dental work done and taking antibiotics. He felt better physically than he had in quite some time. When discussing his readiness and capabilities to return to work, he stated he was unsure of his plans. However, he voiced plans to enroll in college courses in the fall and pursue a finance related degree. Plaintiff's wife had gotten a full-time job and their financial situation was better, which greatly helped his stress level. Plaintiff discussed previous blue-collar jobs he had performed and the numerous confrontations he had gotten into with co-workers. His perceptions of those situations and continued history of irritability, aggressiveness, and lack of remorse had her given cause to add the antisocial personality disorder to his diagnosis. Plaintiff did report some work in a stress workbook he was given early in therapy and found the relaxation and thought stopping techniques helpful to some extent. Ms. Howard discussed transferring him to Dr. Mitch Durham for individual therapy since her internship was ending and he was agreeable to this. He was to call and make an appointment in one month. (Tr. 256-257).

On September 17, 2003, plaintiff stated he had been without medication for 8 weeks, but also denied experiencing any symptoms. (Tr. 284-285). He reported that his financial stressors had been relieved and he was only caring for his four children. Plaintiff indicated that he had been without depressive symptoms since March. His sleep was adequate and, although he had some anger, it was infrequently and only due to normal circumstances. Ms. Armstrong advised plaintiff to discontinue his medications and continue psychotherapy. (Tr. 284-285).

On November 21, 2003, plaintiff was treated via Biaxin for ear pain. (Tr. 325).

On December 8, 2003, plaintiff's earache had resolved, but he could not hear out of his right ear. (Tr. 324).

13

On December 15, 2003, plaintiff reported difficulty hearing.  It appeared as though the doctor diagnosed him with an ear infection and he was prescribed Zyrtec.  (Tr. 323).

On December 29, 2003, plaintiff's ear infection had resolved.  (Tr. 322).

On February 3, 2004, plaintiff underwent an intake assessment with Joyce Bond, a social worker with WACGC. (Tr. 233-236).  Plaintiff was referred by himself and his wife due to irritability, trouble sleeping, and poor concentration.  He relayed a history of irritability and problems handling anger.  Plaintiff stated that his anger was frequently out of proportion to the situation and had often resulted in physical altercations.  Plaintiff was reportedly "always in trouble" in school for beating up other kids, stealing from lockers, and so on.  Several of his behaviors had resulted in legal action and plaintiff was presently on probation after physically assaulting his brother-in-law.  Plaintiff had experienced a period of stability while on medication, but had recently become increasingly irritable and unable to concentrate.  He had been fired from his job at Whirpool due to absenteeism and was currently drawing unemployment and attending college.  He was also working out at the gym. At this time, he also had six children residing in his home as he was caring from several of his in-laws' children.

Approximately two years prior, plaintiff stated that he went out on a "walk-about," experienced a dissociative fugue, and ended up in Fayetteville.  This was, however, a one time occurrence after which he entered treatment at WACGC and began taking medication.  Plaintiff reported "smooth sailing" until December 2003.  Ms. Bond noted that he had been placed on Risperdal, which he said made him sleep for about three days, so he discontinued it.  He was also prescribed Celexa and Trileptol and found them to be helpful.  Plaintiff was very cooperative, friendly, pleasant, and alert.  He reported mild to moderate distress, primarily in the areas previously mentioned regarding irritability.  He also reported poor concentration, which was of particular concern to him as a student.  Plaintiff's affect was appropriate, he reported some difficulty sleeping, his mind reported wandered, he experienced anger problems, and irritability.  He was aware that small things angered him unnecessarily and reported the ability to

14

frequently talk himself out of responding to them.  Although she noted plaintiff's history of major depressive disorder, he had only a couple of the indicators for depression (difficulty sleeping and poor concentration) and did not complain of anxiety.  The complaints he reported seemed more due to concern regarding his irritability and behavioral difficulty than a true depressive disorder.  Ms. Bond concluded that he would fairly readily meet the criteria for intermittent explosive disorder as he had rather discreet episodes of failure to resist aggressive impulses resulting in assaultive acts most of his life.  She stated that he might also have fit the criteria for conduct disorder while in school and that she would need to rule out attention deficit disorder as a possible diagnosis as well.  Plaintiff did not particularly wish to resume psychotherapy at this time as he felt he already had the tools from previous therapy and simply needed to institute those tools in addition to medication management.  Ms. Bond assessed plaintiff with a GAF of 60 and referred him to a psychiatrist for his medication.  (Tr. 233-236).

On February 25, 2004, plaintiff was experiencing mood lability with anger and frustration.  (Tr. 286-287).  He denied depression completely, stating "I'm happy."  However, he was experiencing sleep disturbance causing him to awaken early in the morning.  Plaintiff acknowledged the need for psychotherapy and had reinforced the need for anger management with behavioral and cognitive interventions.  He was in need of therapeutic guidance and learning healthy coping strategies for increased stress.  At this time, plaintiff was a full-time college student with a goal to become a pharmacy technician.  He was receiving unemployment benefits.  Ms. Armstrong prescribed Trileptal.  She noted that his mood was euthymic and his affect congruent and appropriate.  No suicidal or homicidal ideations were present.  (Tr. 286-287).

On March 31, 2004, plaintiff stated that the Trileptal was significantly effective.  (Tr. 288-289).  He had experienced many stressors over the previous week and had handled them calmly and effectively.  Plaintiff's wife had been in car accident the previous day and one of his children's go-carts had been hit by a car.  He stated that he did not react with anger, aggressiveness, or threatening behavior.  In fact,

15

plaintiff was very calm.  He indicated that he was also able to focus and study and his grades were improving.  However, there had been one episode of violence between plaintiff and his brother-in-law during which his brother-in-law was extremely antagonizing and disrespectful in his home.  Without the medication, plaintiff said he would have "blown up as soon as I saw him."  The medication was maintaining his mood effectively and plaintiff was sleeping through the night.  Accordingly, no medication changes were made.  Ms. Armstrong noted that plaintiff's mood was euthymic and his affect congruent and appropriate.  No suicidal or homicidal ideations were reported.  (Tr. 288-289).

On April 29, 2004, plaintiff was doing quite well in college.  (Tr. 290).  The Trileptal was successfully controlling his symptoms and no changes were made to this treatment regimen.  (Tr. 290).

On August 13, 2004, plaintiff denied depression and mood lability, although he had experienced one incident of conflict with his brother-in-law.  (Tr. 291-292).  Ms. Armstrong noted that there had been an ongoing relationship conflict with the brother-in-law because the brother-in-law was leaving his children with the plaintiff for extended periods of time.  Plaintiff told Ms. Armstrong that he was suing the brother-in-law for custody of the children and had a pro bono attorney.  He also indicated that he had been out of medication for 12-13 days.  Ms. Armstrong discussed the risks of noncompliance and he acknowledge that without the medication, he becomes "out of control with anger."  Plaintiff continued with full-time college courses and had begun his own business which was ultimately successful.  Plaintiff was given a prescription for Trileptal, which was noted to be effective for his targeted symptoms.  (Tr. 291-292).

On November 19, 2004, plaintiff was having difficulty controlling his angry responses, which were sufficiently severe to cause a decrease in function and poor concentration that interfered with his study efforts.  (Tr. 293-294).  Plaintiff continued as a full-time college student and was reportedly lacking only 12 hours obtaining his bachelor's degree.  He had a business as well that was thriving and indicated that he was making money.  Plaintiff denied hostility, acting out, or angry episodes.  His family

was intact and doing well without difficulties.  Plaintiff's brother-in-law was in prison for drug related charges and plaintiff continued to pursue at least partial custody of his nieces and nephews.  Ms. Armstrong noted that plaintiff's medication was effective for his targeted symptoms and that plaintiff was taking his medication as prescribed.  (Tr. 293-294).

On May 19, 2005, continued with the same problems reported in November.  (Tr. 295-296).  He reported being out of Trileptal for 6-8 weeks and difficulties with anger explosiveness, aggressiveness, and sleep disturbance.  Plaintiff stated, "Without the medicine I get mean and disoriented."  He acknowledged that the Trileptal controlled his anger when taken as prescribed.  Plaintiff voiced his intent to return to his college studies in the fall due to difficulties combining work, caring for his family, and academics.  Ms. Armstrong agreed to provide him with samples of Trileptal.  (Tr. 295-296).

On June 13, 2005, Ms. Armstrong performed a treatment plan review.  (Tr. 303-305).  She noted his history of hypertension, obesity, ear infections, intermittent explosive disorder, and rule out ADHD. Ms. Armstrong indicated that plaintiff was experiencing difficulty controlling his angry responses which were sufficiently severe to cause a decrease in functioning and poor concentration interfering with his study efforts.  She stated that plaintiff had greatly improved on medication and reported good results with no need for continued psychotherapy.  His psychiatry notes also revealed excellent progress with medication management. (Tr. 303-305).

On November 3, 2005, plaintiff continued to experience difficulty controlling his angry responses which was sufficiently severe enough to cause a decrease in function and poor concentration that interfered with his study efforts.  (Tr. 297-298).  Plaintiff also stated that his mother was a significant source of stress.  Ms. Armstrong provided feedback in ways of coping.  He stated that he had attempted many times to place appropriate boundaries although unsuccessfully.  Ms. Armstrong discussed internal coping.  Plaintiff reported multiple occasions when he could have exploded, but did not, acknowledging that his medication continued to be effective.  (Tr. 297-298).

17

On January 11, 2006, plaintiff presented for his first appointment since intake. (Tr. 258-259). He stated that he was there because his wife and Ms. Armstrong believed he needed to be. Plaintiff did not feel that he did, but said he had no problem with doing so. He felt he was handling his anger much better having had no physical confrontations. Plaintiff stated that he just yelled. His nephew had recently died a very tragic death and he had just returned from the funeral. There continued to be a great deal of stress in his life and he felt there were many demands on his time and attention. Plaintiff said he tried to "chill out, but [his] wife [wooudln't] let [him]." He was reportedly getting up earlier just to have some peace and quiet. Plaintiff was also experiencing nightmares about the boy he accidentally shot and maimed when he was 14. He talked some about his feelings, but was clear that he did not feel the need for continued therapy regarding this issue. Plaintiff was cooperative, pleasant, and very talkative. However, he chose not to continue with counseling. Ms. Bond noted that he had moderate symptoms and/or functional deficits, though not always evident, that interfered with maximum role functioning. (Tr. 258-259).

On April 19, 2006, plaintiff indicated that he had an ear infection three months prior and had used his daughter's antibiotics, but was still having difficulty hearing out of his left ear. (Tr. 321). An examination revealed a yellow discharge in his left ear and blood in his right. Plaintiff also complained of itching and thickening of the skin on his left forearm and elbow. He indicated that this typically flared up in the summer. Plaintiff was diagnosed with suspected psoriasis and ear infections in both ears. He was prescribed Augmentin and cream to apply to his skin. (Tr. 321).

On May 3, 2006, plaintiff's left ear infection had resolved. (Tr. 320). He complained of a cough, but was redoing the bathroom in his home. The doctor diagnosed him with a respiratory allergy, noting that he wore a mask when remodeling. At this time, plaintiff's blood pressure was 132/72. (Tr. 320).

18

On August 1, 2006, plaintiff was referred to the Good Samaritan Clinic due to elevated blood pressure. (Tr. 301-302). Plaintiff had not filled the Trazodone and had not taken his Trileptal in 2 weeks. At this time, he reported experiencing severe depression that included hopelessness, sleep disturbance with middle and terminal insomnia, sadness, low self-worth, poor memory, and suicidal ideation with plan. Plaintiff had endured significant stress recently related to being arrested and possibly facing prison time due to a charge of theft by receiving. He also had past felony and misdemeanor charges in May 2006 for bad checks. Plaintiff was able to acknowledge that he used poor judgment and was impulsive when he won money gambling and chose to spend it unwisely. He also reported impulsivity and poor judgment in his failure to check identification when selling or receiving copper for his metal business. Plaintiff felt he had bad luck throughout his adult life. As a result of his felony charge, plaintiff could no longer pursue his college education as he was no longer eligible for grant money. He denied homicidal ideation, but acknowledged physically assaulting others due to his anger and explosiveness. Plaintiff also acknowledged sleep disturbance related to the stress of being arrested, prior to which he was sleeping well. Ms. Armstrong prescribed Trazodone and Zoloft. She advised his to continue his current dosage of Trileptal and to schedule an appointment with Ms. Bond immediately. Plaintiff denied any memory disturbance resulting from the Trileptal. His mood was said to be dysphoric and is affect depressed. He had not taken his medication in 2 weeks and, as such, it was only minimally effective for his symptoms. (Tr. 301-302).

On August 2, 2006, plaintiff was reportedly in crisis. (Tr. 260-261). He appeared somewhat disheveled, was not clean shaven, was anxious, overwhelmed, and very talkative. Plaintiff detailed a story of being arrested for buy scrap metal from an undercover cop because he failed to ask for identification. This was apparently in connection with a sting operation to shut down illegal steel operations in the area, and many recent thefts. Plaintiff was very down on himself, feeling somewhat angry at the police because he asked them not to go into his house with guns drawn due to his young

19

children.  However, he stated that they proceeded to "tear his house apart searching and took [the] $1100.00 in cash" he kept for buying and selling scrap metal.  Plaintiff reported having a great deal of difficulty controlling his anger, but stated he did not explode.  He did later explode with his wife, asking her to give him the night alone to calm down.  Plaintiff reported additional instances that occurred on this same day during when different individuals presented at his home and the police were called back to the home due to yelling.  Plaintiff now faced charges of theft by receiving and was scheduled for court the following Wednesday.  He was anxious and afraid of going to jail for several years.  Plaintiff was not sleeping and had thought a lot about suicide.  He thought about driving his car off a cliff, but ruled that out because someone would probably need the car.  Plaintiff thought about jumping off a bridge, but that seemed "awful painful."  He felt as though a cloud of mistakes, bad judgment, and a rotten attitude loomed over him, along with a great deal of bad luck.  Plaintiff stated that he could not go back to school and pursue his pharmacy degree due to having a felony hot check conviction a few years prior.  He said someone stole his checkbook and wrote checks.  Plaintiff did not immediately realize the theft and was sent a notice regarding the deadline to pay, which he said he never received.  He gave a history of much trouble in school, fighting, hitting teachers, and absenteeism but stated that he graduated with honors anyway because he paid off the teachers. Plaintiff also reported starting fires as a child, just because he thought it was cool.  For the first time since beginning counseling, plaintiff agreed he was in need of continued therapy.  Ms. Bond noted that plaintiff experienced difficulty controlling angry responses, which were sufficiently severe to cause a functional decline and poor concentration that interfered with his study efforts.  She also diagnosed him with rule out ADHD and antisocial personality disorder.  Plaintiff was directed to continue taking his current medications.  (Tr. 260-261).

On August 8, 2006, plaintiff was stressed.  (Tr. 262-263).  Ms. Bond was not available, so he counseled with Jullian Angell, a social worker at WACGC.  Plaintiff's arraignment on two felony charges was scheduled for the following day.  He reported problems with memory, stating that he "blacks

out" and does not remember what he is suppose to be doing.  Although he claimed to forget many things in life and most conversations, he was able to tell Ms. Angell about his previous sessions with Ms. Bond. He exhibited no difficulty in remembering the details of events of recent weeks.  Plaintiff stated that he would not go to prison and would kill himself if found guilty.  He discussed the same plans noted in his last progress note.  Plaintiff also indicated that a friend had stolen his work equipment and that police were looking for the man.  He wished to find the friend and beat him up.  Plaintiff was mad his friend's only punishment would be going to jail and stated that he wanted to fight with the friend.  He reportedly enjoyed fighting, although he claimed to black out when fighting and not to remember the actual fights. Ms. Angell noted that plaintiff was somewhat defensive from the beginning, but acknowledged some apprehension about meeting with a new therapist.  He was not open to suggestions made by the therapist, often replying, "With my kind of luck, nothing will go the right way."  Plaintiff's demeanor changed completely when he walked into the waiting room though, he was laughing and did not look as though he had ever been mad.  (Tr. 262-263).

On August 16, 2006, plaintiff stated it had been a bad week.  (Tr. 264).  He said his cousin was arrested for stealing his tools.  Plaintiff got most of his tools back and did not go after him like he has previously stated he would.  Knowing he would be violent if he went around his cousin, plaintiff did not go see him.  The cousin was apparently going to be sent back to prison on a petition to revoke parole. Plaintiff had attended his own arraignment and noting unexpected happened.  However, he was questioned concerning another person who had accused him of stealing.  Plaintiff said he would kill himself before his trial because he would rather his children know he was dead than in prison.  Ms. Angell noted that he was more receptive to intervention and suggestions.  He acknowledged the possibility of irrational thinking, but would always follow up these acknowledgments with, "I only think this way because everything that happens to me is bad."  Plaintiff also acknowledged he had experienced

some good luck, such as winning over $6,000.00 a few weeks prior, but quickly reverted back to the negative. (Tr. 264).

On August 28, 2006, plaintiff stated that his brother-in-law had died the previous week from heat exhaustion. (Tr. 265). He and this brother-in-law had been planning to leave in late September to go work on a fishing boat off of Alaska. Plaintiff used his death to further evidence his bad luck. He also stated that his other brother-in-law's two children were still living with him. Plaintiff was worried their parents would never take them back and indicated that the mother would not terminate her rights so plaintiff and his wife could make all necessary decisions regarding the children. He and his brother-in-law had become physically aggressive over this issue the previous weekend and he gave the brother-in-law three weeks to get things together. Ms. Angell noted that plaintiff was open, honest, and mildly receptive to suggestions. He remained skeptical of some of her suggestions, but seemed to putting forth some effort. (Tr. 265).

On September 6, 2006, plaintiff was sad and intermittently teary over the death of his brother-in-law. (Tr. 266). He stated that his wife had raised her brother since age 12, so they were all very close. Plaintiff indicated there had been 9 deaths in his extended family over the previous 8 months. He also processed some grief over the loss of his mother-in-law a few months prior. Plaintiff stated that his 18 year old daughter was moving out and that this was a positive move for the family. Ms. Bond noted that plaintiff was willing and open in expression of his grief. He said it was helpful and acknowledged his need for continued therapy. (Tr. 266). On September 12, 2006, plaintiff continued to experience significant stress, but reported feeling somewhat better. (Tr. 267). He had experienced a panic attack that morning, but was proud of himself for maintaining his anger management without resorting to physical violence. However, he did report the necessity of yelling because it was the only way he could get people to listen to him. Plaintiff blew up at his wife and his mother because they would not leave him alone and let him work. He reportedly asked them nicely and they would not leave him alone, so

22

he said he had to yell and get mean.  Plaintiff expressed frustration at trying to meet everyone else's needs and did not feel that his family put importance on his work.  Ms. Bond noted that plaintiff agreed that control may be an issue for him.  He said he had to think about the pleasing issue, although he saw some truth to Ms. Bond's suggestion.  (Tr. 267).

On September 25, 2006, plaintiff complained of pain in his ears with yellow and red drainage.  (Tr. 319).  Plaintiff was diagnosed with chronic bilateral otitis.  He was prescribed Keflex and another medication. (Tr. 319).

On September 26, 2006, plaintiff reported decreased depression and no angry outbursts.  (Tr. 268).  He continued to experience difficulty setting boundaries for himself in relation to family demands and continued to express grief over the loss of his mother-in-law.  Plaintiff was currently ill with pneumonia and was under a doctor's care.  He acknowledge his devotion to his children.  However, it was difficult for him to accept any credit for their successes and tended to downplay his role in their development.  (Tr. 268).

On October 16, 2006, plaintiff was treated for bilateral ear problems.  (Tr. 318).

On October 17, 2006, plaintiff was dealing with a lot of anger, following a period of relative calm.  (Tr. 269).  The negative thinking had returned.  Plaintiff was also experiencing financial difficulties and was not getting enough "down time."  He was angry about his own pessimism, stating that the anger sometimes came out of nowhere.  Plaintiff acknowledged that previously learned coping skills had sometimes worked.  He had been walking to relieve stress and anger and had been practicing some relaxation techniques with some level of effectiveness.  (Tr. 269).

On October 24, 2006, plaintiff was depressed and had begun processing a tragedy that occurred in his early teens.  (Tr. 270).  He had accidentally shot one of his best friends during a hunting accident.  The friend was severely disabled and the friend's father had never forgiven plaintiff.  Plaintiff had also not forgiven himself.  He was tearful as he described the event, stating he still smelled the blood on his

shirt, felt it, and got a headache just thinking about it.  Plaintiff had reportedly locked himself in his room for 2 days after the accident and only came out because his father cut out the doorknob to gain access.  He said he thought he had put this behind him, but realized by the intensity of feeling that he had not.  Plaintiff acknowledged feeling stymied by not knowing how to go about forgiving himself.  He agreed to think about it and said he had never considered a possible connection between this tragedy, the father's blame, and his current self assessment.  (Tr. 270).

On November 7, 2006, plaintiff called just prior to his session stating that he was experiencing suicidal ideation.  (Tr. 271-272).  During the session, he was feeling a bit suicidal but the feelings were not as strong as they had been earlier in the day because someone had paid him a compliment.  Plaintiff stated that the feelings really scared him.  He had made several bad financial decisions and realized after his last session that gambling might be a bigger problem than he had thought.  Plaintiff had decided not to go back to the casino, as he linked everything to money.  He gave a history of selling drugs as a teenager, getting into fights, paying teachers off to pass him, and so on.  Plaintiff acknowledged highs and lows dating back to his teen years and wondered if he was self-destructive.  Toward the end of the session, plaintiff admitted to being off Trileptal for two weeks because he had not had time to take it.  Plaintiff agreed to restart his medication and call if his suicidal thoughts returned.  He also planned to stop gambling and regain control of his finances.  (Tr. 271-272).

This same date, plaintiff reported bright red blood in his stools for 6 days.  (Tr. 317).  However, this had resolved at the time of plaintiff's visit.  He was diagnosed with resolved rectal bleeding and advised to call and schedule a follow-up visit.  (Tr. 317).

On November 8, 2006, plaintiff was voluntarily admitted to Living Hope hospital due to depressive symptoms.  (Tr. 331-355).  He was experiencing suicidal ideation and planned to kill himself via electrocution, but his plan was thwarted by his children.  Plaintiff admitted that he had been noncompliant with his medications for 1 to 2 weeks.  He was diagnosed with mood disorder not

24

otherwise specified, personality disorder not otherwise specified, and rule out antisocial personality disorder and his medications were reinstituted.  Plaintiff showed improvement and was released on November 15, 2006.  He was tolerating his medications without side effects and was less irritable.  Both individual and family psychotherapy were recommended.  (Tr. 331-355).

On November 20, 2006, plaintiff continued to be extremely depressed since his hospitalization for suicidal thinking.  (Tr. 273).  He began by saying it seemed like people would be better off without him.  Plaintiff said he was only feeling one emotion and that was anger.  He said he felt less suicidal and had no plans to act on those feelings.  In fact, plaintiff admitted that the feelings scared him.  He reported being afraid to go to sleep because the feelings were harder to control at night.  Plaintiff was easily able to make a list of sources of his anger and quickly realized that he was most angry at himself.  He found it difficult to let go of his anger.  (Tr. 273).

On November 27, 2006, plaintiff continued to be depressed and angry.  (Tr. 274).  He related a family argument over Thanksgiving, during which he finally gave in to a request that he did not want to give in to.  A huge argument ensued with his siblings.  Plaintiff was fearful of going outside, which was extremely unusual for him.  He was afraid something bad would happen.  Plaintiff said he was not really angry right now, just afraid.  He was cleaning house, making candles, and "suddenly cooking." Plaintiff added that he had taken all of the televisions and computers out of his home and put them up. He planned to try this for one week because he was tired of the noise.  Plaintiff also voiced his desire to paint the walls white.  Ms. Bond noted that this behavior clearly represented a departure for plaintiff, but he was perhaps making a transition toward increased stability.  He appeared calm and quite in session, much less hyper than usual.  (Tr. 274).

On December 5, 2006, plaintiff reported increased forgetfulness and difficulty with decisions. (Tr. 275).  His wife was not letting him make decisions because he was making poor decisions.  Plaintiff agreed with her assessment, adding that he almost cut his son's hand with a power saw due to his

25

inattentiveness.  He said that he just wanted to go away and is somewhere else in his mind most of the time.  Plaintiff did report improved sleep and noticing things he had not previously noted.  He was definitely less hyper, both in thought and action.  He did not report any angry responses this week and was a bit flat emotionally.  Plaintiff said he was not suicidal but acknowledged continued depression.  He felt worthless, but was unable to state why, other than his continued belief that he messed up everything he does.  (Tr. 275).

On December 10, 2006, plaintiff complained of decreased coordination and uncontrollable jerking approximately 30 minutes prior to his presentation in the ER.  (Tr. 306-314).  He reportedly felt faint and almost fainted.  A CT scan of his brain was normal.  Plaintiff was diagnosed with near syncope and a headache.  (Tr. 314).

On December 12, 2006, plaintiff completed his homework and was able to list something positive every day for the previous week.  (Tr. 276).  He went to the emergency room one night after feeling dizzy, experiencing a headache, and falling over.  Plaintiff thought he was having a heart attack, but was diagnosed with a panic attack.  Otherwise, he reported some improvement in his mood and function, though he feared not being able to return to work.  Plaintiff was calm and continued to be more calm and observant than he had been in the past.  He was appreciative of the session and agreed to practice relaxation techniques.  (Tr. 276).

This same date, plaintiff reported experiencing an anxiety attack on December 10.  (Tr. 316).  At the time of his appointment, plaintiff's symptoms has subsided and he felt ok.  The doctor noted that plaintiff had no seizure activity by history and was taking Depakote for anxiety.  He diagnosed plaintiff with anxiety/depression and right serous otitis.  Plaintiff was prescribed Depakote and Amoxil.  (Tr. 316).

26

On December 15, 2006, plaintiff stated he had not been taking his medication for the past week and had been yelling at the kids a lot and getting angry. (Tr. 315). Plaintiff's Depakote dosage was adjusted and he was prescribed Zyprexa. (Tr. 315).

On December 20, 2006, plaintiff complained of continued mood lability. (Tr. 459-460). He now reported symptoms of generalized worrying with anxiety and stated that he felt that something would go wrong. However, he was also drinking caffeine at night and it was suggested that he cut back to minimal caffeine use after 2:00 pm. Further, plaintiff ad been prescribed Zyprexa to take as needed for sleep. After being warned of the risks involved, plaintiff threw the medication away. Ms. Armstrong indicated that plaintiff would continue the Depakote to stabilize his mood and made no dosage changes. For anxiety and sleep disturbance, she prescribed Vistaril. Ms. Armstrong also noted that he was taking Amoxicillin for an ear infection. She found plaintiff's mood to be euthymic and his affect calm. Ms. Armstrong also stated that his medication was effective for the targeted symptoms. (Tr. 459-460).

On December 27, 2006, plaintiff continued to work on anger management problems as well as anxiety and depression. (Tr. 458). He had been in a recent confrontation with family, following which he got involved in a physical confrontation with a stranger who took his parking place. The police were called and the stranger, who was inebriated, was arrested. Ms. Bond noted that plaintiff had minimized his response, but quicky agreed that he looked for opportunities to fight. He had also attempted to get into a boxing club or class and was disappointed to find that none existed in this area. (Tr. 458).

On January 2, 2007, plaintiff reported feeling something akin to empty nest syndrome, as his two youngest children had returned to their biological father after 7 years. (Tr. 457). His older daughter was also moving out for school. Plaintiff reported no additional explosive outbursts, but admitted to significant anxiety concerning the possibility of serving jail time. He was, however, able to say that something good would come out of his situation. Plaintiff continued to have great difficulty leaving the

27

house and did so only at his wife's insistence.  Ms. Bond noted that he was talkative, but calm with linear and goal-directed speech.  He was able to think positive and discuss things rationally.  (Tr. 457).

On January 9, 2007, plaintiff was again experiencing mood swings and had been fighting with his wife all morning.  (Tr. 456).  He had processed his fears about going to prison and was significantly calmer.  Plaintiff was also much better able to process events and work on changing his angry responses. (Tr. 456).

On January 26, 2007, plaintiff had shown significant progress with anger management.  (Tr. 455).  Someone was hanging around his house and had taken up residence in an empty building on his property.  Plaintiff took the proper procedures and called the police.  He also processed anger at his daughter's employer, who refused to give her a promotion because the police told them that her father was under suspicion for theft by receiving.  Again, plaintiff was angry enough to want to punch the guy out, but did nothing.  Finally, his wife's sister-in-law was filing charges against them, claiming they refused to let her see her children.  While he and his wife had the children (6-8) years, she rarely came to see them.  Plaintiff stated that he had never refused her visitation and that the charges were bogus. Ms. Bond noted that plaintiff showed significant progress with anger management, as evidence by rational behavior in situations which previously resulted in physical confrontation.  His mood was stable and he posed a low risk of harm to himself.  (Tr. 455).

On January 31, 2007, plaintiff continued to process family conflicts and relationship patterns. (Tr. 454). He had experienced another incident that angered him, but he was able to react calmly to it and not resort to violence.  Plaintiff reported no suicidal thought, no homicidal thought, and continued to improve his anger management skills.  Plaintiff remained highly anxious regarding his court date.  (Tr. 454).

On February 2, 2007, plaintiff acknowledged Depakote as completely effective in controlling his mood lability and anger.  (Tr. 453).  His sleep was restful and he denied experiencing medication side

28

effects.  Plaintiff had not filled the Vistaril, stating that he was sleeping well, although he was experiencing some anxiety related to his upcoming court date.  Plaintiff felt that he could cope with his anxiety through counseling with Ms. Bond and with the Depakote as a mood stabilizer.  Ms. Armstrong noted that plaintiff had been referred back to Good Samaritan Clinic due to elevated blood pressure.  His mood was euthymic and his affect calm, congruent, and broad.  (Tr. 453).

On February 6, 2007, plaintiff continued to work on problems related to anxiety.  (Tr. 452).  This week, he had misplaced several hundred dollars in cash (his wife's paycheck) and was extremely frustrated with himself.  He had yet to find the money, although they had reportedly turned the house "upside down."  Plaintiff also reported several incidents of impaired memory and continued anxiousness regarding his upcoming court date.  He was slipping back into his everything happens to me mode.  Plaintiff was responsive to relaxation technique and continued to report improved anger management and no suicidal thinking.  (Tr. 452).

On February 28, 2007, continued to deal with legal difficulties related to suspicion of theft by receiving and had gone to court the previous week.  (Tr. 451).  Plaintiff's case was scheduled for a jury trial.  He had filed suit against the city police for wrongful arrest and entrapment.  (Tr. 451).  Plaintiff indicated that he planned to calm down between now and Mary 12, his court date.  He added that he had been sleeping better and continued to have mood swings, but wondered if they were true mood swings or simply a reaction to stressful events.  (Tr. 451).

On March 2, 2007, plaintiff denied anger, violence, and impulsive behavior.  (Tr. 450).  Ms. Armstrong noted that his judgment was fair.  She stated that the Depakote would be continued at its current dosage. Ms. Armstrong was awaiting faxed records from his recent hospitalization.  Specifically, she was interested to see his liver function levels and other appropriate lab work considering the Depakote treatment.  Plaintiff discussed his upcoming court date and the strategies planned by his attorney.  He was quite positive that he would have a good outcome.  Plaintiff's mental status was

normal.  He was taking his medication as prescribed and it was effective for the targeted symptoms.  (Tr. 450).

On March 26, 2007, plaintiff's anxiety level had increased as his court date drew closer.  (Tr. 449).  His ability to manage anger appropriately had again declined.  Plaintiff had conflict with several family members and had a verbal altercation with a store clerk.  In short, he had a "real bad week."  Reportedly, plaintiff continued to practice daily relaxation and credited this and his medication with helping him maintain.  Ms. Bond noted that plaintiff was having great difficulty letting go of his need to prove rightness and was able to acknowledge that it would be in his best interest, all things considered.  (Tr. 449).

On April 6, 2007, plaintiff acknowledged that the Depakote was effective in controlling his anger, violence, and impulsive behaviors.  (Tr. 448).  Ms. Armstrong noted that his judgment was fair at this time.  Plaintiff's mental status was normal, he was taking the Depakote as prescribed, and it was effective for the targeted symptoms.  He posed no risk of danger to himself or others.  (Tr. 448).

On April 9, 2007, plaintiff continued to be anxious over his upcoming court date.  (Tr. 447).  He stated that he had thought about suicide the previous Friday.  Plaintiff voiced no active intent in this regard, but was quite anxious.  His father's nephew had also recently died and plaintiff said some of the family members were angry because he did not want to attend the funeral.  Plaintiff was upset over family conflicts, but had been able to manage his angry outbursts.  He had also been approved for SSI.  Ms. Bond noted improved coping skills and reduced explosiveness.  (Tr. 447).

On May 24, 2007, plaintiff reported having gone to court and receiving 2 years probation and a $4500.00 fine.  (Tr. 481).  He was currently attempting to pull together $875.00 for the judge to avoid having additional fines added and was somewhat overwhelmed and anxious about the task.  Plaintiff was also a bit angry at himself for having gone to the casino, hoping to win, but losing $100 instead.  Plaintiff

30

agreed he frequently became overwhelmed, which limited his creative problem solving.  He also agreed that gambling was a poor coping skill.  (Tr. 481).

On June 5, 2007, plaintiff had met his court obligation and paid his fines to date.  (Tr. 480).  He was very relieved and stated that his mood was stable.  He was on probation and seeing his probation officer monthly.  Plaintiff reported problems with his probation officer's attitude.  He reluctantly agreed he had more to lose than his probation officer if they had serious disagreement.  Plaintiff added that he had kept his anger in check for months, with no serious outbursts, although he had been yelling at his kids too much.  (Tr. 480).

On June 8, 2007, stated he was doing well on the Depakote ER and Vistaril.  (Tr. 479).  He was not having difficulty controlling his anger responses and continued to see Ms. Bond for therapy.  Plaintiff had been a little depressed lately, but 11 days ago, he was placed on a 6 year suspended sentence with two years probation and had a probation officer who now came to his home monthly.  Plaintiff felt depressed because of the decision he had made.  He filed for disability and finally got a letter back stating he had been scheduled for medical and psychiatric evaluations this month.  Ms. Tosh indicated that plaintiff was to continue his current medications, as they were effective.  His mood was euthymic with a broad, congruent affect.  Plaintiff's judgment and insight were also fair.  (Tr. 479).

On June 18, 2007, plaintiff saw Dr. Baker for an SSI evaluation.  (Tr. 391-392).  Plaintiff had reportedly undergone pressure equalization tube insertion on at least 3 occasions, once with a tonsillectomy and adenoidectomy at age 14.  He was a cigarette smoker and his wife felt he would have swelling in the back of his neck during episodes of acute otitis media.  Plaintiff was currently taking only Depakote.  However, he also complained of a history of pneumonia, lower back pain, and carpal tunnel syndrome.  An examination revealed mild cerumenosis that was cleaned in both ears.  The TMs were atrophic, moderately retracted, but intact and without cholesteatoma.  He had a golden ME effusion on both sides with TFs inconsistent.  Audiogram, however, suggested hearing in the right ear at the upper

31

limits of normal with high frequency SN loss in the left ear suggesting noise exposure, although plaintiff denied this.  Both nostrils were patent with moderate edema of the nasal mucosa, consistent with chronic rhinitis.  Plaintiff had not polyps or signs of infection.  He had numerous missing teeth, but no oral lesions.  Posterior pharynx was unremarkable with tonsils absent.  Palpation of the neck showed no adenopathy and he had several linear scars on the posterior neck suggesting scratching and subsequent scarring of the skin as a child.  Dr. Baker concluded that plaintiff had minimal conductive hearing loss. Plaintiff was encouraged to stop smoking and return as needed.  (Tr. 391-392).

On June 27, 2007, plaintiff underwent a mental diagnostic evaluation with Dr. Kathleen Kralik. (Tr. 359-368).  Plaintiff claimed to be disabled because he could not hold down a job for any length of time due to anger management problems/aggressive acting out in workplace situations and forgetting what time he was suppose to go to work.  Although plaintiff stated that he could tell time, he reported losing watches frequently and relying on his wife to keep him on schedule.  He stated that he was doing better with his anger management now that he was on Depakote and alleged to be reading a book on anger management.  Plaintiff reported experiencing a nervous breakdown about four years prior during which he became very angry, stormed out of the house, refused to tell his wife where he was going, and hitchhiked to Fayetteville.  He does not remember how he got to Fayetteville, but when he emerged from the woods, his wife was there to take him to the hospital for a psychiatric assessment.  Plaintiff voiced experiencing feelings of frustration and anger when in large crowds.  He also reported memory problems starting a few months before the breakdown. Plaintiff also admitted to abusing substances beginning around age 10 or 11 and continuing until age 19.  He stated that he had done well in school, until he accidentally shot one of his best friends during a hunting accident.  Plaintiff claimed to maintain close contact with the friend and to get along well with him.  (Tr. 359-368).

Plaintiff reported a brief hospitalization at Sparks in 2003 and a referral to WACGC for suicidality.  (Tr. 359-368).  He alleged continued weekly visits with his therapist, indicating that he

32

became anxious when he did not see her.  Plaintiff was also hospitalized in Little Rock for seven days

due to his mental health.  Dr. Kralik noted that plaintiff tended to exaggerate; seeming to distort

information relative to whatever impression he was trying to create at the moment.  She noted obvious

exaggeration on mental status exam tasks and that he appeared to be more inattentive and deceptive than

cognitively or emotionally impaired in any evident manner.  Dr. Kralik estimated plaintiff's level of

cognitive functioning to fall in the average range.  Speed and efficiently of processing seemed adequate

when he was being attentive.  Plaintiff was alert and fully oriented with a predominantly normal mood

and appropriate affect.  He tolerated the stress of the interview well and never seemed irritated or even

on the verge of losing his temper.  She indicated that plaintiff seemed quite bright and capable of

adequate attention although he tried to portray himself as more cognitively limited/impaired than was

the case.  Angry outbursts seemed associated, from his description, with frustration and especially

narcissistic wounds/his sense of entitlement, than seeming to be associated purely with some type of

cyclical mood disorder.  Similarly, if plaintiff was truly experiencing panic attacks, Dr. Kralik found

them to be minor, infrequent, and again secondary to frustration.  The problems he described seemed

more associated with his parasitic/dependent personalty style and associated immaturity rather than with

any other mental or cognitive condition per se.  It also seemed as though a possible ADHD like

condition-as it impacted his tendency to make inattentive mistakes or to give in to impulses, may at times

have a mild to moderate negative impact on his occupational functionality–though not at a level that

should preclude all forms of occupational functionality.  Even though it had been argued that plaintiff

suffered from a mood disorder of some sort, Dr. Kralik noted him to be quite calm, relaxed, fully in

control of his emotions, and able to deal with frustration and confrontation well during the interview.

She also concluded that plaintiff's alleged mental breakdown was more likely one of his manipulative

actions designed to evoke attention and possible sympathy-especially from his wife who he called in the

middle of the episode.  Dr. Kralik stated "If he has really been seen by [WACGC] for the most part

33

weekly for 4 years, surely they would have made a more definitive diagnosis of a bipolar disorder long before the most recent hospitalization this past fall." Even if bipolar I disorder were a possibility, she did not find it in any way to be responsible for his job losses. Dr. Kralik diagnosed plaintiff with ADHD and personality disorder no otherwise specified with strong antisocial, parasitic, and narcissistic personality features. She assessed him with an estimated global assessment of functioning score of 51-60. (Tr. 359-368).

As far as plaintiff's ability to carry out activities of daily living and daily adaptive functioning was concerned, Dr. Kralik did find it to be somewhat impaired for occupational purposes. (Tr. 359-368). However, his mental/cognitive condition did not seem in any way to be of a nature or severity that should preclude all forms of gainful occupational pursuits. Dr. Kralik found his primary problem to be his social/emotional immaturity and parasitic style of dependence on family members to attend to responsibilities for which he was fully capable. Plaintiff indicated that bathing and shaving were a problem because he did not like to bathe and always cut himself. She noted that he was malodorous, but associated it more with his disregard for others and immaturity than mental illness. Although he had a drivers license, plaintiff stated that he did not often drive because he became preoccupied with thoughts or would day dream while driving and would miss his turns. Plaintiff denied spending money impulsively, but did admit to losing it and giving it away. He stated that he spent his days performing chores like mowing and picking up the yard. Plaintiff indicated that he cuts himself on knives when washing dishes because he forgets they are in the sink. He also reported that he was not allowed near the laundry, aside from helping fold it, and that he vacuumed the living rooms and bedrooms. Dr. Kralik estimated plaintiff's capacity to communicate and interact in a socially adequate manner to be functionally adequate for occupational purposes. His capacity to communicate in an intelligible and effective manner was generally adequate, although he did report some difficulty misperceiving when he read or instructions given. Plaintiff's capacity to cope with the typical mental/cognitive demands of

34

basic work-like tasks seemed somewhat impaired as he likely had difficulty with poor frustration tolerance, impulse control, and anger management. His ability to attend and sustain concentration on basic tasks seemed problematic, but it was difficult to ascertain whether his inattentiveness was genuine or exaggerated. Plaintiff tended to persist on what he was focused on, rather than what was expected of him. His capacity to sustain persistence in completing tasks also seemed problematic. Dr. Kralik concluded that a combination of ADHD symptoms and motivational/volitional issues predisposed him to give in to his own needs rather than attending to the needs of others or his responsibilities. Plaintiff reported doing better on short-term tasks. His ability to complete work-like tasks within an acceptable time frame also seemed somewhat impaired, which seemed to be associated with his volitional/personality issues rather than mental issues. However, his inattentiveness to detail might consume more time and negatively impact his accuracy of task completion. (Tr. 359-368).

On July 5, 2007, plaintiff was having to work as a condition of his parole. (Tr. 478). He had attempted 16 jobs in the past several weeks. Plaintiff had a physical altercation with one individual in the work place, but was quick to point out that it was the other person's fault, although both men were sent home. Plaintiff had great difficulty with various aspects of the work, but said there were a couple of jobs he actually liked. However, these were temporary jobs. Ms. Bond noted that plaintiff was eventually willing to concede that there were other ways to handle the situation with his co-worker, other than fighting. (Tr. 478).

On July 17, 2007, plaintiff said he was getting depressed and was not doing anything he enjoyed. (Tr. 477). He went on to say that he was a failure and did not do anything right. Ms. Bond noted that plaintiff was able to accept some of the reframing exercises but continued to have difficulty not perceiving himself as a failure. He agreed that he needed more time alone and more enjoyment in his life, but was again trying to please those around him. Plaintiff clearly grasped that when he did not like himself, he did not like others. (Tr. 477).

35

On July 27, 2007, a treatment plan review indicated that plaintiff had recently made progress with anger management, even after additional legal difficulties. (Tr. 470-476). He was on probation for receiving stolen goods and had been able to show improved coping skills to prevent outburst on occasion, but was not able to exhibit these consistently. Records also indicated that since his hospitalization for suicidal thought and intent, plaintiff had made mild to moderate improvement in coping skills to deal with this and was working in therapy to eliminate suicidal impulse altogether. He reported that his medication was helpful. (Tr. 470-476).

On July 31, 2007, plaintiff was furious because someone had stolen his wife's phone and he could not get it back. (Tr. 469). He was able to process his angry feelings and gain insight into his reactions, realizing that he was as angry at his feeling of helplessness as he was at the theft itself. He was also awar of feeling violated. Plaintiff indicated that his memory was worse. Ms. Bond noted that he had increased anger management skills. She informed him that anxiety often caused increased memory problems, along with difficulty concentrating. (Tr. 469).

On August 7, 2007, plaintiff was stressed out about not getting any time alone and frustrated because every time he had some time alone, his wife intruded. (Tr. 468). Plaintiff asked her to let him have time, but she refused to honor his request. He said he had given up trying. In other areas, plaintiff reported doing better, but wished he could go back to work. He said he had managed his anger and had no further outbursts. (Tr. 468).

On August 21, 2007, plaintiff reported no angry outbursts and no depression. (Tr. 467). His anxiety had increased somewhat due to environmental issues. He stated that school had started back and trying to get four children up in the mornings was difficult. Plaintiff was off Vistaril and felt he was doing fine without it. He was advised to continue Depakote ER. Bethany Tosh noted that plaintiff was not taking his medication as prescribed, as he was no longer taking the Vistaril. However, the Depakote ER was said to be effective without medication side effects. (Tr. 467).

36

On August 30, 2007, plaintiff was referred to the Good Samaritan Clinic by WACGC because they believed he might be suffering from diabetes. (Tr. 444). Tests had shown elevated blood sugar levels. Plaintiff was diagnosed with diabetes and prescribed Metformin. He was also to attend a diabetic education class at Spark's Hospital. (Tr. 444).

On September 12, 2007, plaintiff's hands were breaking out in a rash. (Tr. 399). He indicated that his daughter had the same rash. Plaintiff was diagnosed with cellulitis and diabetes. Plaintiff was prescribed Metformin and Keflex. (Tr. 399).

This same date, plaintiff indicated that he had been diagnosed with diabetes and that his blood sugar level was 560. (Tr. 466). He was told that his biggest problems was with his hands, which had increasingly pained him to the point he could no longer mow grass or perform any household chores. Consequently, he was having to ask for assistance from his 16 year old son who was not very helpful and plaintiff was losing his temper frequently. Plaintiff had also been denied disability because the psychiatrist, who he said saw him for 20 minutes, told him he could work. Ms. Bond discussed parenting issues with plaintiff and helped him devise a plan to deal with his teenage son. He agreed and planned to follow through. (Tr. 466).

On September 20, 2007, plaintiff was diagnosed with diabetes and joint pain. (Tr. 398). He indicated that the joints in his hands were aching and it was difficult for him to close his fingers. The doctor prescribed Mobic. (Tr. 398).

On September 25, 2007, plaintiff requested assistance in filling out disability paperwork. (Tr. 465). He reported an improved relationship with his son and followed the suggestion to draw clear limits without emotional response. Plaintiff was becoming frustrated with his wife for monitoring him so closely on his eating. He had already lost weight and listed numerous dietary changes. Plaintiff reported no further angry outbursts this week, but said his probation officer was mad at him and called him a retard. Ms. Bond noted that plaintiff was appropriately appreciative for her assistance and seemed to

37

be calmer in his interactions with others.  She also advised plaintiff her completion of the disability paperwork might not be sufficient, as they might require a doctor's response.  (Tr. 465).

On October 5, 2007, plaintiff sought treatment for blisters on his feet that had been present for the last few weeks.  (Tr. 397).  His feet were also itching and hurting.  The doctor noted that his diabetes was better.  Plaintiff was diagnosed with diabetes and advised to use warm epsom salt soaks.  He was also prescribed antibiotics and referred to podiatry.  (Tr. 397).

On October 8, 2007, plaintiff was doing better following an alleged episode of hypoglycemic shock the previous night.  (Tr. 396).  Plaintiff had gone all day without eating and his blood sugar dropped.  Plaintiff was diagnosed with diabetes and referred to podiatry for a diabetic evaluation.  (Tr. 396).

On October 9, 2007, plaintiff complained of small clear blisters and a rash on his feet.  (Tr. 395).  He had also experienced an episode of low blood sugar, but had taken his medication without eating that day.  Following an examination, the doctor diagnosed plaintiff with tinea pedis (athlete's foot) and prescribed ointment to apply to his feet.  (Tr. 395).

On October 16, 2007, Ms. Bond completed a psychiatric review technique form and a mental RFC assessment.  (Tr. 410-425).  She diagnosed plaintiff with a dissociative fugue occurring in 2003 when he found his way to Fayetteville; memory impairment; disturbances in mood; impulse control impairment; depression; anxiety; and, antisocial personality disorder.  Ms. Bond found plaintiff to have moderate restrictions in activities of daily living; moderate restrictions in maintaining social functioning, concentration, persistence, and pace; and, evidence of four or more episodes of decompensation.  She also rated his ability to follow work rules, relate predictably in social situations, and demonstrate reliability as poor and his ability to relate to co-workers, deal with the public, use judgment, deal with work stress, understand, remember, and carry out complex job instructions, maintain personal appearance, and behave in an emotionally stable manner to be only fair.  Ms. Bond noted that plaintiff's

38

ADHD impaired his concentration and his anger management and impulsivity problems seriously limited his ability to work with others.  Further, he frequently missed appointments due to his impairments.  Although not a doctor, Ms. Bond also noted that diabetes could also seriously impair a person's physical and mental health if their blood sugar level dropped too low or went too high.  (Tr. 410-425).

On November 2, 2007, plaintiff hands and feet continued to hurt and swell occasionally.  (Tr. 443).  The doctor noted that his diabetes was "much better."  Plaintiff was diagnosed with joint pain and diabetes and prescribed Salsalate.  (Tr. 443).

On November 29, 2007, plaintiff stated that he was doing well on Depakote.  (Tr. 464).  He still had a temper, but it was not as bad.  No gambling urges or depressive symptoms were reported, and his mood was stable.  Plaintiff had diabetes and had begun taking Metformin.  He had reportedly lost 39 pounds and felt good about that.  Plaintiff denied experiencing anxiety and continued to see his therapist biweekly.  No medication side effects were noted.  (Tr. 464).

On February 1, 2008, plaintiff followed up concerning his recurrent right scapular pain.  (Tr. 442).  Plaintiff felt cold and was out of Mobic, which was helping his right carpal tunnel syndrome.  Tenderness was noted in the right infrascapular area.  Plaintiff was diagnosed with scapular bursitis and diabetes.  He was prescribed Mobic.  (Tr. 442).

On February 25, 2008, plaintiff complained of bilateral ear pain and a sore throat.  (Tr. 441).  Plaintiff was diagnosed with chronic bilateral ear infections.  He was prescribed Amoxicillin and medication to be applied in his ears.  (Tr. 441).

On March 11, 2008, plaintiff presented for his first therapy session in several months.  (Tr. 463).  He talked about how his arrest had changed his entire life, and while he was resentful, he was mostly discouraged and quite depressed.  Plaintiff said he could vote and loved to vote.  He couldn't hunt or even target practice, and felt his whole sense of who he was had been squashed.  Plaintiff believed the situation to be quite unfair and noted that both of his arresting officers had either been discharged or

39

demoted for mishandling evidence.  He felt totally powerless to fight it because he could not afford an

attorney.  Plaintiff reported no angry episodes and no suicidal thinking.  Ms. Bond noted that plaintiff

had not been coming in for therapy, but continued his medication management.  He understood that he

could come in if in a crisis.  Plaintiff felt he was handling things okay.  (Tr. 463).

On September 9, 2008, plaintiff indicated that he had fallen and was experiencing back, chest,

and right side pain and wanted to have his feet checked out.  (Tr. 440).  He was tender to the touch.

Plaintiff had gone to the emergency room, but the wait was long and decided to leave and go to the Good

Samaritan Clinic.  The doctor advised plaintiff that he needed to return to the emergency room because

he would need an x-ray.  He was diagnosed with carpal tunnel syndrome and prescribed Mobic.  (Tr.

440).

On September 11, 2008, plaintiff complained of pain and burning in his feet.  (Tr. 438-439).  He

also complained of pain in his hands, stating that the Mobic was not working.  It appears as if plaintiff

were experiencing pain in his fourth and fifth fingers and swelling in his hands.  The doctor diagnosed

him with diabetes neuropathy, diabetes, and bipolar disorder.  Medication was prescribed, but the

handwriting is not discernable.  (Tr. 439-439).

On September 15, 2008, plaintiff presented for therapy for the first time in several months.  (Tr.

462).  He reported increased physical and emotional problems.  Plaintiff's diabetes had reportedly

worsened to the extent he was told he may lose his feet.  This had increased his anxiety and he had

experienced 3 anger outbursts recently and recurrent dreams of the accidental shooting of his childhood

friend.  Plaintiff also reported 2 additional dissociative fugues or "walkabouts" as he called them, which

occurred following arguments about financial problems.  He complained of increasing memory and

concentration problems as well as being clearly overwhelmed.  Ms. Bond recommended increased visits

and strongly suggested continued work on early trauma.  She also encouraged him to contact the

Diabetes Association regarding possible financial assistance to obtain the proper foot wear.  Plaintiff was

responsive to therapy, acknowledging anger problems as his own, rather than attempting to shift the blame.  Plaintiff was clearly very fearful of losing his feet and his already poor coping skills were severely taxed.  (Tr. 462).

**IV.**    **Discussion**:

Plaintiff contends that the ALJ erred in dismissing plaintiff's subjective complaints, failing to properly consider the mental RFC assessment of plaintiff's treating therapist, relying on Dr Kralik's mental status evaluation to conclude that plaintiff's mental impairments did not meet the listings, concluding that plaintiff's carpal tunnel syndrome did not constitute a severe impairment, failing to request an RFC assessment from plaintiff's treating doctor, concluding that plaintiff could perform work that exists in significant numbers in the national economy, and failing to compare plaintiff's RFC to the duties required by the jobs the VE testified plaintiff could perform.  We will begin our analysis by examining plaintiff's subjective complaints.

The ALJ was required to consider all the evidence relating to plaintiff's subjective complaints including evidence presented by third parties that relates to:  (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and, (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id*.  As the United States Court of Appeals for the Eighth Circuit  recently observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the record, we believe that the ALJ adequately evaluated the factors set forth in *Polaski*, and conclude there is substantial evidence supporting his determination that plaintiff's

41

complaints were not fully credible.  The testimony presented at the hearing as well as the medical evidence contained in the record are inconsistent with plaintiff's allegations of disability.

We note that plaintiff has been diagnosed with a variety of mental impairments, including ADHD with intermittent explosive disorder, mood disorder not otherwise specified, personality disorder not otherwise specified, antisocial personality, impulse control impairment, manic depression, depression, and anxiety.  After reviewing the entire medical record, we note that plaintiff experienced ups and downs with his illness and treatment.  However, the overall impression is that plaintiff's condition is treatable via medication.  Plaintiff's main problem appears to have been problems with anger management.  However, the record is replete with instances wherein plaintiff reported both the ability to control his aggression and the fact that the medication was effective in treating his impairments.  *See Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling).  It is clear, however, that there were multiple periods during which plaintiff failed to take his medication as prescribed.  (Tr. 242, 256-257, 271-272, 281, 284-285, 291-292, 295-296, 301-302, 315, 331-355, 467).  And, it was during those instances when plaintiff had the greatest difficulties with his aggression and depression.  *See Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) ("A failure to follow a recommended course of treatment . . . weighs against a claimant's credibility.)."

Plaintiff was also diagnosed with diabetes and issues regarding his feet.  The evidence indicates that his blood sugar levels were very high when he was first diagnosed.  However, plaintiff's condition responded well to medication.  (Tr. 443).  *See Patrick*, 323 F.3d at 596.  We could also find no evidence to indicate that plaintiff was in danger of losing his feet.  He was diagnosed with diabetic neuropathy on only on occasion, in September 2008.  (Tr. 438-439).  Prior to this, he had been diagnosed with blisters on his feet and athlete's foot.  (Tr. 395, 397, 438-440, 443).  While his treating doctor had referred him

42

to a podiatrist, we can find no evidence to indicate that plaintiff ever followed-up with a podiatrist.  *See Guilliams*, 393 F.3d at 802.

Plaintiff was also treated for chronic shoulder, neck, and back pain.  Testing revealed only small disk bulges at the T2-3 and T5-6 levels without significant canal/foraminal stenosis and only mild degenerative disk and arthritic changes.  (Tr. 159, 175).  *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider).  No disk herniations or range of motion limitations were noted in any of his evaluations.  And, no neurological deficits or motor deficits were ever documented. There was also no evidence to show plaintiff consulted with an orthopedist as he was advised to do on numerous occasions. *See Guilliams*, 393 F.3d at 802.  In fact, in spite of the level of impairment alleged by plaintiff, he was only admitted to the hospital on one occasion for intractable back pain and muscle spasms.  The remainder of his treatment was performed via appointments with his doctor.  Accordingly, the record simply does not support a finding of disability based on back, neck, or shoulder pain.

The record does contain evidence indicating that plaintiff suffered from recurrent ear infections and a slight level of hearing impairment.  However, we note that none of the doctors examining plaintiff noted plaintiff having any difficulty following the conversation or understanding what was said during his appointments.  Accordingly, we do not find that his level of hearing impairment would prevent him from performing all work-related activities.

Plaintiff also suffered from hypertension, which eventually responded to medication,  mild coronary artery disease, and osteoarthritis.  (Tr. 201).  *See Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling).  A cardiac catheterization revealed only a 40 percent distal stenosis in the right coronary artery and an estimated left ventricular ejection fraction rate of 70 percent.  (Tr. 203-205).  As the listings require a left ventricular ejection fraction of thirty percent or less and a cardiologist's

conclusion that the performance of an exercise test will present a significant risk to the individual, it is clear that plaintiff does not meet these requirements.  20 C.F.R. Pt. 404, subpart. P, App. 1, § 4.04. Likewise, there is no evidence to suggest that plaintiff's hypertension was so severe as to interfere with his ability to perform work-related activities.

Further, plaintiff contends that the ALJ erred in finding his carpal tunnel syndrome to be non-severe.  We noted that the record contains only one diagnosis of carpal tunnel syndrome.  There are, however, no objective tests to substantiate this diagnosis.  In fact, both plaintiff and his attorney indicated that plaintiff had not undergone tests to confirm a diagnosis of carpal tunnel syndrome.  *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider).  An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities. *See Bowen v. Yuckert,* 482 U.S. 137, 153, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *id.* at 158, 107 S.Ct. 2287 (O'Connor, J., concurring); 20 C.F.R. § 404.1521(a).  If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two. *Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir. 2007).  It is the claimant's burden to establish that his impairment or combination of impairments are severe. *Mittlestedt v. Apfel,* 204 F.3d 847, 852 (8th Cir. 2000).  Severity is not an onerous requirement for the claimant to meet, *see Hudson v. Bowen,* 870 F.2d 1392, 1395 (8th Cir.1989), but it is also not a toothless standard, and we have upheld on numerous occasions the Commissioner's finding that a claimant failed to make this showing.  *See, e.g., Page*, 484 F.3d at 1043-44; *Dixon v. Barnhart,* 353 F.3d 602, 605 (8th Cir.2003); *Simmons,* 264 F.3d at 755; *Gwathney v. Chater,* 104 F.3d 1043, 1045 (8th Cir.1997); *Nguyen v. Chater,* 75 F.3d 429, 431 (8th Cir. 1996).  It seems clear to the undersigned that plaintiff's alleged carpal tunnel syndrome does not constitute a severe impairment.  Had his condition been severe, we believe he would have undergone testing to confirm the diagnosis and to determine the proper treatment.

44

Plaintiff's reported activities also undermine his claim for disability. On paperwork he submitted to the Administration, plaintiff stated that he sometimes helped out around the house and helped his children with their homework. (Tr. 166). He also indicated that he could care for his personal hygiene (although sometimes needing help with buttons), prepare simple meals four to six times per week, do laundry, sometimes vacuum, pick up trash out of the yard, walk, drive a car, use public transportation, count change, watch movies, and play checkers and cards with the children. (Tr. 167-170, 189-193). In addition, plaintiff testified that he and his wife had cared for his five nieces and nephews in addition to their own four children, for approximately six years while his brother was in prison on drug related charges. (Tr. 36-38). At the time of the hearing, three of them remained in their home. *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).

Perhaps the most damaging, however, is plaintiff's own admission that he attended college on a full-time basis, ran his own business, sought out employment, and received unemployment benefits at different times during the relevant time period. (Tr. 233-236, 249-250, 286-294, 301-302). In 2007, plaintiff also worked at approximately 16 different jobs as a condition of his parole. (Tr. 478). He also reported performing repairs and renovations to his home and making candles. (Tr. 237-238, 249-252, 267, 274, 320). We note that attending college on a full-time basis is inconsistent with a claim of disability. *See Tennant v. Apfel*, 224 F.3d 869, 871 (8th Cir. 2000) (claimant was attending college part-time, carrying 17 credit hours of chiropractic classes while maintaining a C average); *Long v. Chater*,

45

108 F.3d 185, 188 (8th Cir. 1997) (claimant enrolled as a drafting major in community college, taking as many as 8 hours and making the dean's list); *Grace v. Sullivan*, 901 F.2d 660,662 (8th Cir. 1990) (claimant was a full-time college student and obtained bachelor's and master's degrees). Working and/or seeking work is also incongruent with allegations of disability. Further, the acceptance of unemployment benefits, which entails an assertion of the ability to work, is at variance with plaintiff's claim of disability. *See Salts v. Sullivan,* 958 F.2d 840, 846 n. 8 (8th Cir. 1992).

Plaintiff's cousin, Melissa Thornberg testified on his behalf. (Tr. 53-56). She stated that she had known plaintiff her entire life and saw him at least three or four times per week. Ms. Thornberg indicated that plaintiff had not been able to take care of himself nor his family for several years. She testified that plaintiff's back gave him a great deal of difficulty, causing him to hunch over, limp, and even not be able to get out of bed. Ms. Thornberg also reported that plaintiff had a "very short fuse," and flew "off the handle over a rock being in the road, or for no apparent reason." (Tr. 53-56). This testimony was properly considered by the ALJ, but found to be unpersuasive. This determination was within the ALJ's province. *See Siemers v. Shalala*, 47 F.3d 299, 302 (8th Cir. 1995); *Ownbey v. Shalala*, 5 F.3d 342, 345 (8th Cir. 1993).

Therefore, although it is clear that plaintiff suffers from some degree of impairment, he has not established that he is unable to engage in any and all gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). Neither the medical evidence nor the reports concerning his daily activities supports plaintiff's contention of total disability. Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

46

Plaintiff contends that the ALJ erred by failing to develop the record with an RFC assessment from plaintiff's treating doctor.  The ALJ has a duty to fully and fairly develop the record.  *See Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995)(ALJ must fully and fairly develop the record so that a just determination of disability may be made). In determining whether an ALJ has fully and fairly developed the record, the proper inquiry is whether the record contained sufficient evidence for him to make an informed decision. *See Payton v. Shalala*, 25 F.3d 684, 686 (8th Cir. 1994); *Matthews v. Bowen*, 879 F.2d 422, 424 (8th Cir. 1989).  After reviewing the record, we believe that it contains sufficient evidence upon which to base an RFC assessment.  Accordingly, we find no error in the ALJ's failure to seek an RFC assessment from plaintiff's treating doctor.

We next turn to the ALJ's determination that plaintiff had the RFC to perform unskilled light work that does not involve transaction interaction with the public and requires only occasional exposure to loud background noise, occasional telephone usage, and occasional crawling and climbing.  RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record.  *Id*.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations.  *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

In the present case, the ALJ carefully reviewed the medical records, plaintiff's subjective complaints, the plaintiff's testimony regarding his daily activities, and the functional limitations set forth

by the physicians. On June 27, 2007, Dr. Alice Davidson completed a physical RFC assessment. (Tr. 356-358). After reviewing his medical records, she concluded plaintiff did not have a severe physical impairment. (Tr. 356-358). This was affirmed by Dr. Bill Payne on October 23, 2007. (Tr. 405).

On July 3, 2007, Dr. Kay Cogbill completed a psychiatric review technique form and a mental RFC assessment. (Tr. 369-390). After reviewing plaintiff's medical records, she diagnosed plaintiff with ADHD and intermittent explosive disorder, mood disorder not otherwise specified, and personality disorder not otherwise specified. Dr. Cogbill found plaintiff's ability to perform activities of daily living to be mildly impaired while his ability to maintain social functioning and maintain concentration, persistence, and pace was moderately limited. She also concluded that plaintiff was moderately limited with regard to carrying out detailed instructions; maintaining attention and concentration for extended periods; sustaining an ordinary routine without special supervision and without being unduly distracted; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; responding appropriately to changes in work setting; and, setting realistic goals or making plans independently of others. No episodes of decompensation were noted. (Tr. 369-390). This was affirmed by Dr. Dan Donahue on October 19, 2007. (Tr. 402).

While we note Ms. Bond's RFC assessment, we are also cognizant of the evidence indicating that plaintiff's condition was controllable via medication. We also recognize that Ms. Bond, a mere social worker, is not an acceptable medical source. Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. §§ 404.1513(a), 416.913(a) (2007). According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others: (1) Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment, (2) only acceptable

48

medical sources can provide medical opinions, 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007), and (3) only acceptable medical sources can be considered treating sources, 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007).  Other sources: Medical sources include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. Non-medical sources include school teachers and counselors, public and private social welfare agency personnel, rehabilitation counselors, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers.  20 C.F.R. §§ 404.1513(d), 416.913(d) (2007).  "Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-3p. "Instead, there must be evidence from an 'acceptable medical source' for this purpose. Accordingly, we do find that the ALJ considered Ms. Bond's opinion, but her opinion was not entitled to substantial weight, as she was not an acceptable medical source.  Further, given the contradiction between her RFC assessment and the overall medical record, we do not believe Ms. Bond's assessment would have even been entitled to significant weight had she been an acceptable source.

After reviewing Dr. Kralik's RFC assessment in conjunction with plaintiff's medical records, we find that it is consistent with the overall evidence of record.  Therefore, given that objective tests had revealed some slight abnormalities in plaintiff's thoracic spine and he did have some limitations resulting from his mental impairments, we find the ALJ's RFC determination to be supported by substantial evidence.  While it is clear that plaintiff did suffer from some problems related to anger management, it is also clear that his condition was treatable via medication, when plaintiff took his medication.  His college attendance, the repairs and restoration projects he performed on his home, and the fact that he ran his own business for a period of time also evidences his ability to perform work-related activities, in spite of his mental and physical impairments.  As we can find no evidence to suggest that plaintiff's activities were limited further by his treating physicians, we find substantial evidence to support the

49

ALJ's RFC assessment.  *See Baldwin v. Barnhart*, 349 F.3d 549, 557 (2003) (physicians noted few abnormalities, and none of Plaintiff's independent physicians restricted or limited P's activities).

We also find that substantial evidence supports the ALJ's finding that plaintiff can still perform work that exists in the national economy.  The vocational expert testified that a person of plaintiff's age, education, and employment background could perform light work involving no transaction interaction with the public, occasional loud background noise, occasional telephone usage, and occasional climbing, could perform work as a shirt presser, dry cleaning worker, and inspector.  (Tr. 57-59).  He also identified each of plaintiff's previous jobs and categorized them according to the level of work performed.  (Tr. 56-57) .*See Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997); *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996).

Citing  *Ingram v. Chater*, plaintiff contends that the ALJ failed to make an explicit finding regarding the actual physical and mental demands of his past work.  However, *Ingram* deals with the ALJ's step four responsibilities when assessing a claimant's ability to perform his or her past relevant work.  *See Ingram v. Chater*, 107 F.3d 598, 604 (8th Cir. 1997).  In *Ingram* the Court found that the ALJ "should compare the claimant's residual functional capacity with the actual demands of the past work to determine whether the claimant is capable of performing the relevant tasks.   A conclusory determination that a claimant can perform past work without these findings does not constitute substantial evidence that the claimant is able to return to his past work." *Id.*

In this case, however, the ALJ determined that plaintiff was not able to return his past relevant work, because he did not have the exertional capacity to perform work at the medium or heavy exertional levels which was required by his past work.  (Tr. 83).  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) ("If we cannot find that you are disabled or not disabled at a step, we go on to the next step").  The ALJ then properly determined plaintiff's RFC and, based on that RFC, the vocational expert testified

50

regarding work plaintiff could still perform.   Accordingly we can find no error in the ALJ's determination that plaintiff could still perform that exists in the national economy.

**V.**      **Conclusion**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus recommends that the decision be affirmed, and plaintiff's Complaint be dismissed with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).   The failure to file timely objections may result in waiver of the right to appeal questions of fact.   The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this <u>3rd</u> day of June 2010.

/s/ *J. Marschewski*

HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

51